Okay, if you're ready, the next case is 09-1378, captioned the General Protecht Group against the International Trade Commission. Mr. Long, you've revised the schedule. Okay, Mr. Chen. Mr. May, representing Tremont. Of course, Mr. May. Good morning, Your Honors. May it please the court. Tremont's appeal centers on one question, whether the term load terminals, as claimed in the 340 patent, includes receptacle outlets. Now, receptacle outlets have been referred to as user-load terminals, user-accessible load terminals, or receptacle terminals, but not as the claimed load terminals. Are they referred to in the patent as user-load terminals? Not in the 340 patent specifically, but in the related patent, 386 patent, that has two common inventors and derived from the same patent application. The inventors defined user-load terminals as receptacle outlets. But it's not in this patent. Not in the 340 patent. So the commission suggested that the name user-load terminals suggests user-load terminals are a type of load terminals. However, just as guinea pigs are not pigs, seahorses are not horses, Tremont urged this court to look past linguistic similarities. But I'm confused. Why, you seem to be conceding that the term user-load terminals has some significance here when it doesn't appear in the 340 patent. Oh, we are not, Your Honor, it's Tremont's position that we are not conceding that term, but however, at the commission level, it appears the commission's decision is based on the linguistic similarities. That's the reason we, in our brief, we... I would have thought your argument was we should look at the 340 patent and limit ourselves since we're trying to figure out what the claims in the 340 patent mean. I mean, you know... No? Obviously, we can limit the intrinsic evidence to the 340 patent. However, because of the 340 patent, the patent itself does not define, does not equate receptive outlets to user-load terminals. If the court ends inquiry here, that's fine. However, at the commission level, the issue has been raised that receptive outlets has also been referred to as user-load terminals. So it is Tremont's... In another patent. In another patent. So, yeah, I agree with you, Your Honor. Not once, not once does the 340 patent ever refer receptive outlets as user-load terminals. Why isn't it fairly construed that load terminals, that receptacle, receptable outlets are just a type of load terminal? Exactly, that's the reason we want to... Your Honor, we want to look, based on the case law of Phillips v. AWH Corporation, so we are looking to intrinsic evidence. And if needed, extrinsic evidence. So it's Tremont's position, nothing in the intrinsic evidence. Thus, and in other patents, I mean, those two patents, or 340 patent, never refer to receptable outlets as load terminals. So there's no evidence. All the Jordan specifications never mentioned receptable outlets as load terminals. The problem is this, that in general usage, a receptacle outlet could be called a load terminal, right? No, no, no, no, we disagree. In the general usage, the issue has been raised based on 386 patent. Receptable outlets can be called as user-load terminals, but the problem... Right now, I'm talking about general usage. I'm not, forget about these patents. I thought there was, and correct me if I'm mistaken about that, I thought there was expert testimony that in the field that receptacle outlets would be known as load terminals. Is that correct? With all due respect, I mean, we disagree with that characterization. But was there not expert testimony to that effect? There was nothing in the record below ever show, ever equate. Was there expert testimony that receptacle outlets are referred to in the field as load terminals? Okay, let's take a look. Was there such testimony? Yes. No, no, no. No, there was no such testimony. There was no such testimony? Experts and witnesses have been very careful at the trial in referring to receptacle outlets as user-load terminals, or user-accessible load terminals. Not once did any witness specifically refer to receptacle outlets as load terminals. So that's the reason we want to highlight that if the court look past linguistic similarities and look into intrinsic evidence, all the drawings and nothing in the specification equate receptacle outlets to load terminals. And rather, they clearly label receptacle outlets as distinct and separate components from load terminals. And that's, I know my time's up, but let me just highlight expert testimony. Dr. Harmon testified, not in connection with 340 patent, but in connection with 386 patent. He said, quote, on this, from Joint Appendix 40408, at page 892, lines 15 through 18, Dr. Harmon testified, quote, load terminals would be the terminals for any devices or outlets or appliances that would be connected to the device, end quote. The device meaning GFCI device. So even here, Dr. Harmon said, load terminals are the terminals for outlets, receptacle outlets, to be connected to the GFCI device. So he himself clearly distinguished receptacle outlets as distinct and separate components from the load terminals. And so, he said, quote, the GFCI device would be the terminal for any device. Okay. All right. Thank you, Mr. May. Okay, Mr. Long. Sorry for the confusion about your work. Yeah. Again, I'm counsel for General Protect, and in this part of the appeal, General Protect is an appellate. I'm gonna focus on non-infringement of the 340 patent. And the 340 patent is one of the patents that provides for miswiring protection. There are two issues. One is the clamp construction issue. The detection circuit requires, it must be capable of, quote, detecting a proper wiring condition, detecting a proper wiring condition. And the other issue is, does GPG's device have a circuit that's capable of detecting a proper wiring condition? So do you, I'm sorry, so just to be clear, do you take issue with the clamp construction, or simply on the infringement issue? The clamp construction, we take issue with application of the words that we use. So the- On the infringement, so whether it infringes based on the clamp construction, so you're not challenging the clamp construction. Well, I guess it means what does detecting mean? We do not- Isn't your argument that the clamp construction was elaborated when the infringement issue was considered, so we have a clamp construction which goes beyond the initial one? Yes. So detecting, we don't have issue with the word detecting, but the way the claims apply, we didn't actually require a circuit to detect. And detect requires a circuit to distinguish between proper wiring and improper wiring. The way the claims apply, it was just for one way. So let me give us a clear example. Let's say there's a microphone here, and it sends a signal to the speaker, say it's a female voice detector. Is this microphone a female voice detector? Well, no, it sends a signal for a male voice or a female voice. What the court below said, well, this sends a signal on a female voice, therefore, it's a female voice detector. Now, the way GPG's device works, what if we put a guard on the floor, right here, and we don't let anybody come to the courtroom but females? Well, now they would say, well, only females can come into the room, so now this microphone is a female voice detector. Well, it's not. It's the same microphone that was always there. The way GPG's product worked is, the miswiring protection of GPG's product- The signal here is the AC current, right? I'm sorry? The signal is the AC current. The signal that is sent in the claim? Yeah, not in the accused device. Well, I'm not sure exactly what they say is the signal, but what they- Well, it has to be the AC current, wouldn't it? Yes, it's AC current, if I understand this question. But the way GPG's device works is, when the interrupting contacts- Is your point that the AC current doesn't distinguish between proper and improper wiring? No, that's not it at all. That's not it? It is that we don't have a circuit that can distinguish. It cannot physically distinguish. And our real argument is, that there is absolutely no evidence below of a circuit that can distinguish. They just say it works when there's correct wiring, but they want the court to look away on what happens when there's incorrect wiring. And you have to consider how the circuit works on incorrect wiring, or you can't show it as the detection circuit. And there's absolutely no evidence below. There was never even the accusation that the circuit could tell the difference between proper and improper wiring. As the patent, the circuit and the patent can tell the difference. And it inhibits device operation on improper wiring. The accused circuitry and GPG's device can't do that. It can't. It's completely isolated from this wired circuit, from the miswired circuit when it's tripped and the contacts are open, when the alleged detection circuit is, it's not doing anything. When the contacts are closed and reset, and it's miswired, the accused detection circuit senses the miswiring, that it allows the device to operate just as if it were properly wired. So this accused detection circuit is not doing what the patent says it's supposed to. Let me see if I can understand it. In the accused device, if it's miswired, the AC current does not burn out the solenoid. Am I correct about that? And the- When it's miswired, yes. In the patent, when it's miswired, it trips and does not burn out. Right. And what happens in the accused device? In the accused device, so in the patent, the miswired circuit trips on miswired. In the accused device, the accused circuit doesn't do anything. It's completely isolated from power. It doesn't do anything. And how does it protect against miswire? It doesn't. That's the whole point. We do not have a circuit that protects against wiring. We protect against wiring using the interrupting contacts. We separate all the circuitry on one side of the interrupting contacts. So when the power is miswired, everything's dead. We don't need circuitry to protect. Now, in the reset state, we don't have miswiring protection. You mean if the current is coming in through the load terminals, it doesn't operate to reset? In the trip state, everything's dead. Yeah. In the reset state, it allows it to operate, even if it's miswired. In the trip state, it won't allow you to reset because there's no power to do it. Right. That would be just everything that's just dead. Now, I see my time is up. It is. Thank you. It is. Thank you, Mr. Long. Okay, Mr. Chen. Good morning, Madam President. I'd like to use the floor again. Again, Shanghai ELE has issues with regard to the 398 pattern and the 340 pattern. With regard to the 398 pattern, we think the commission did not construe the unitary electroplate conducting member correctly because we urge the construction to include the physical nature of the single unitary conducting member to be in the nature of a bus bar. Therefore, it does not cover the prior art type cantilever type of conducting member. In the prior art, there is cantilever type of conducting member where the conducting member is connected on the line side and is movable on the low side. So it's like an arm moving up and down like this. But on one side, on the line side, on the hot side, it's always connected. Only on the low side, it's movable. But is that the distinction you're drawing or the distinction that was drawn by which you say it is of the nature of a bus bar? That's right. The nature of a bus bar is the line side and low side both making and breaking. You have to have a supporting member to move it up and down. Now, in the prosecution history, the 398 pattern with that particular regard was rejected based on prior art on that point because the prior art showed a cantilever type of conducting member. Now, the applicant, in order to get allowance, said, no, we have a conducting member in the nature of a bus bar. So the question is whether the construction now covers both the, as the commission did, cover both the bus bar and the prior art cantilever member. Shanghai ELE's device follows the prior art cantilever member kind of configuration. And in that configuration, you do not need a support mounting member. So that's why we take issue on both the construction of the unitary conducting member and also the mounting member of the 398 pattern. Now, with regard to the 340 pattern, we believe we support and agree with the argument made with regard to the detecting circuit made by GPT. But additional point on claim 14 of the 340 pattern that requires a predetermined signal. Now, in the trial, the expert agreed, we have expert testifying that in Shanghai ELE's device, there is no predetermined signal. And as a matter of fact, even past CMOS expert agreed, Dr. Harmon testified that in claim 14 of the 340 pattern, the predetermined signal is used to differentiate whether or not there is correct wiring. So the predetermined signal has a function that differentiate between correct wiring and incorrect wiring. So it's not any signal. It's not just AC current coming from the hub that can be construed as the predetermined signal. The AC current coming from the hub is AC current. It is not a predetermined signal to differentiate the wiring state. So that is our argument. That's why we say the 340 pattern, in that we did not take the, the Shanghai ELE's product does not have a predetermined signal to satisfy that particular limitation of claim 14. I understand the argument. And I was originally asking GP, G lawyer as to what they were making that argument. Is there a difference between the two of you on that, that you're making the predetermined signal argument. You're saying the AC current is not a predetermined signal, correct? Yes. They're not, that doesn't help them. Well, with regard to the detection, we concur with their analysis argument. We make a further argument that the predetermined signal in claim 14. Yeah, I understand. But what I'm not understanding is the predetermined signal argument doesn't help them avoid infringement. Is that the situation? Is that why you're making the argument? They're not. With regard to how their product work, we only argue on our side about. Okay. Thank you, Mr. Chen. Okay. Mr. Berkowski, you're next for the IPO meeting. Thank you. Good morning, again. May it please the court. I submit that what we have here is a mirror image of what we had with the appeal we argued earlier. And that's specifically true with respect to the detection limitation. Well, I think that there's a real issue about the detection circuit. And to talk about mirror images, probably not too helpful. As I understand the two arguments about the detection circuit, could you address those? Yeah, absolutely. This claim 14 of the 340 patent claims the detection circuit configured to generate a predetermined signal in response to detecting proper wire. Okay, so why isn't AC currently predetermined signal? What's predetermined about the AC current? There's not a specific definition of predetermined, but in an electrical device, the way these things work is, in order to detect, do you have proper wire? Do you have wire to the right side of the device, the line side? What the device does is it detects, is that power on the right side? And sure enough, what does it detect? But the signal doesn't have any information. It's just an AC current, right? It's AC current to the correct side. And this is the important distinction. In the trip state of these devices, they do indeed detect, is there proper wire, is the power to the correct side of the device, or is it incorrect? But the AC current doesn't tell you anything about whether it's proper wiring or not. The signal itself doesn't tell you anything, right? It does though, your honor. The existence of wiring going to this circuit, flowing through it in the way that, in the way that everything is. I mean, so you're saying it's a predetermined signal because if it's there, it's one thing. If it's not there, it's the other. Basically so. That's how the device detects, is the wiring to the right side? It distinguishes between the two. And specifically, and this is important, your honor, in the trip state of the device, which is what this claim contemplates, because it uses the predetermined signal to substantially prevent the device from affecting the receipt state. So suppose we were to rule against you on predetermined signal. Does that affect GPG or only ELE? Regarding predetermined signal, ELE is the only appellant on this side of the bill that makes that argument. They argue that it needs to have a preset value. Now I would, I'd like to take that point just one step further, your honor. There's nothing in the patent that says that it needs to be. So suppose we say, okay, we disagree with you. Predetermined signal, AC current's not a predetermined signal. Does that affect both GPG from your point of view as well as ELE or not? Only ELE appealed that issue, and I presume. Well, they appealed the issue about whether this claim limitation is satisfied. They may not, they may make a different argument. Is there any reason, is there anything about the device that makes a difference under that construction of predetermined signal? Both of them detect the AC path. Is there any difference between the two devices from that point of view? I'm assuming we rule against you, just hypothetically, okay, on predetermined signals. Does that mean the GPC, GPG device doesn't infringe? Your honor, it's just not a question the commission has answered or analyzed because it's not presented to us. And I know, I'm trying to answer your question. They both do operate in a similar way, and that is detecting whether the power, they isolate the left side, and they detect whether the power's to the right side. And if they don't detect that, the device is prevented from affecting the reset state, just as is called for in the claim. If they do detect it, they send the signal that it has received proper wiring, it detects it, and sure enough, it allows the device to be reset, knowing that the power is on the proper side. The reset lockout devices, as we discussed in the earlier case. Turning to the argument that Tremont makes about low terminals. Is that a claim construction question or an infringement question, whether or not low terminals include user low terminals? It was addressed in the claim construction section. It was raised as somewhat of a tangential issue. It was addressed in the claim construction portion of the ALJ's ID, and that was not reviewed by the commission. So that is where it's addressed. So why, given the use of the terms in the 386 patent, shouldn't that distinct use be persuasive evidence in how we're gonna construe that here in the 348? Well, the separate uses of the two terms, user low terminals and low terminals, in the 386 patent, I think is, it's of a somewhat limited value with respect to the sibling patent, the 348. But even with that said, if you look at it and if it was absolutely determinative, all that means is that user low terminals are naturally a subset of low terminals. And that's consistent with the testimony that Mr. May informed you of by Dr. Harmon, and that's that the user low terminals, the receptacle outlets or terminals, they accommodate a load, and that load is plugged in by the user. They're naturally low terminals. The question of- The comment that I see is that in the 348 patent, there isn't any reference to low terminals or user low terminals that includes receptacle outlets. Correct? That is correct, Your Honor. And that's why the, it's basically, the judge tried to figure out what does this term mean in the art? And who did he ask? Well, it's not just mean in the art. The first thing we want to find out is what it means in, from the point of view of the intrinsic evidence. And the intrinsic evidence doesn't suggest that the term low terminals includes receptacle outlets, does it? It does, and that's somewhat what I was just saying, in that receptacles are terminals and they accommodate loads. Sure enough- I'm talking about what the patent says about it. I'm not talking about what the testimony was. Right. I'm looking first at the patent. I looked at the 340 patent. I don't see anything in the specification that tells me that a receptacle outlet is encompassed within the term low terminals. Is there anything in there that suggests that? It's basically silo-tested. It refers to them separately, which, as I just said, that it certainly implies they have a different scope, but it doesn't render them mutually exclusive. So what the ALJ did was, he heard testimony from the ARC, he looked to the 386 patent, and he determined, and I'd like to point out, too, there's an absence of testimony that user low terminal is not a low terminal, which I think is the more natural definition. I think that's why they're basically arguing for a specific definition. There is testimony- Okay, you're gonna tell us what the testimony is so we know why that's what you call a natural definition? Well, the testimony was, and the ALJ found this, it's cited in our brief at page 42, I believe. And the testimony was, low terminals would be the terminals for any devices or outlets or appliances that would be connected. In other words, he's saying that they're terminals and that they accommodate the load. The load there would be the appliance. Yeah, yeah, yeah, but was there testimony that in the field that people use the phrase low terminals to refer to receptacle outlets? I mean, you know, I don't attribute a lot of significance to expert testimony that says, well, if you take this piece and you combine it with this piece, it means this, and I've studied it, and here's my view. I want to know, is the terminology the low terminals used in the ARC to refer to receptacle outlets? Is there such testimony? The test, I mean, I think the clearest testimony is what I said. Did somebody say exactly what you said? Not that I'm aware of, I mean, I've never seen it, but I don't think so. I think that the testimony was that, yes, these are terminals. They're accessed by downstream devices, which are loads, and appliances, air dryers, and such.  I mean, it has meaning in the industry. A receptacle has meaning, and an understanding. No, low terminal. Did somebody testify, this is a term of art in the industry, you know, here are textbooks, here are things, this is what it means. Did, no. No, basically no. What the expert testified to was that receptacles would be considered low terminals. Because? Because they're terminals that accommodate the loads, and those loads would be the appliances, or downstream devices, which would be the downstream load terminals. But what we have is an absolute absence of testimony that those load terminals, load terminals accessed by a user, are not load terminals. And that's what I think. It doesn't help very much. Well, it does, if you take that they acknowledge that a user, that these things are properly referred to in the art. I mean, you've told me that there's no, this is not a phrase that anyone identified as being used in the art. So, I don't get much help out of the expert testimony. Then I look at the patent, and I don't see any usage in the patent that suggests that load terminals include receptacle outlets. You've got a problem. In the 386 patent, it refers to receptacles as 340, the 340. In the 340, it refers to them separately as receptacles and load terminals. So that doesn't help you. It doesn't help, and it doesn't necessarily hurt your art. I know, but I think Judge Dyke was looking for help for your side. And I would look to the expert. I would look to the expert testimony. I would look to just the natural meaning of the words of load terminals and user load terminals. And I would really look to their argument. They have the advice of people in the art from their client and people, and experts in the art. And notably absent is anybody saying, we don't consider user load terminals to be load terminals. I see that a lot of times. Do you have any more? Mr. Rabate, give Mr. Rabate his time. Thank you, Your Honor. I'd like to address the four sets of interrupting contexts first. And I want to address the question about how people understood this in the art. We do have expert testimony that was mentioned. Dr. Harbin said that outlets can be called load terminals. But in addition, there was a fact witness from our company who's a person who worked in the field many years. And what did he say? He said that outlets are a type of load terminal. That's at page A40378. It appends Mr. Austin Rock. We also have A40378. It's transcript page 779 to 780. But Your Honor, another thing you should look at, this idea of what's the understanding of the art, I suggest you look at the 398 patent. And the reason why the 398 is relevant, filed six years prior to the 340. And what does it say? It calls the terminals on the face of the device load terminals. Doesn't call them user load terminals. Calls the terminals on the face of the device load terminals. This is the 398 patent. It's page A403. And that's in column six, line 27 through 45. And it's referring to figure 11. The reference numerals there are the load terminal of 92 and 94. They call the face of the terminal load terminals. Not user load, just load terminals. So in addition to the testimony, we have the 398 patent. Now, we could turn to the intrinsic evidence. And the intrinsic evidence is, first, the DiSalvo art of record. That art of record is an intrinsic evidence. And it calls the terminals on the face of the device user load terminals. That's a type of load terminal. In addition, I would point to the 340 patent itself. Now, we did point to one reference in column one, where the outlets on the front were talking about handling loads. I mean, these are electrical devices. What a terminal is on an electrical device is a load. I want to bring you back to 40378. This testimony, it doesn't seem to me, talks about how the phrase load terminals is used in the art. It says, we differentiate by calling them load terminals. To me, that's not clear that he's referring to the usage in the art, as opposed to how he's using the term in his testimony. Oh, Your Honor, he was the Vice President of Engineering at Aston Seymour. So that suggests to you. Where does he say that this has a meaning in the art? He said, we call them load terminals. Well, we at Aston Seymour call them load terminals. Well, maybe for the purposes of this case, we call them that. I don't know what he was saying. Your Honor, he's talking about the G4 product. That's a product that was in the case. It was one of our domestic industry products. It's a Patson Seymour product. And he says, the load terminals, the screw terminals, and the face terminals were one piece. What does that mean? That's what's shown in the 398 patent. The screw terminal on the back and the terminals on the face of the device were one solid piece of metal. And he calls it a load terminal. In the G4 product, which is a product in the case, he's talking about how P&S, he's the Vice President of Engineering, how does P&S refer to this term? So that's a person of skill in the art talking about that, in addition to expert testimony. But I would say, look at the 398 patent as well. It's clear as a bell. It calls the terminals on the face load terminals. And it's actually showing the very type of load terminal he's talking about. It's the G4 load terminal that he's talking about here. The 386 patent, a couple things to mention about that. First, that's an extrinsic evidence. It is part of the same family of patents. But it's a continuation of part of the family. And the disclosure they rely on is extrinsic. Now, I would say it supports us. It calls the terminals on the face user load terminals. I say it supports us. But nonetheless, it's not intrinsic evidence. The intrinsic evidence in the 340 patent, I mentioned column 1. But I'd also refer you to the top of columns 2 and column 4. They talk generally about the line and load side of the device. And you can see this in the 340 patent in figure 4. The line and load side of the device are referred to generically. So don't think that receptacles are always broken out as something different. In fact, in figure 4, the load side of the device is referred to generically. And that includes both the load terminals in the back of the device and the load terminal on the face of the device. And then you'll see that in top of columns 2 and 4 as well. Is anybody going to talk about the mounting means issue and the latching means issue in the 398 patent? I can. I would like to address the detection issue also. If you'd like me to start on other issues, I will. Well, you can go ahead and do that. But I'd like to ask questions about that, because I don't want to. Nobody else is going to talk about that, right? That's it. I mean, the respondents didn't raise it. So I wasn't going to raise it if they did. Well, I don't care whether they raised it or not. Sure. My ability to understand this has nothing to do with whether they raised it or not. Let's talk about the detection means. And then we'll answer Judge Dyke's questions about the mounting means. Thank you, Judge Newman. So in detection, GPG is doing the same thing here that they did at the commission. They're ignoring how the product works in normal operation. When the product comes out of the box, it's in the tripped state. When you install it properly, there is a signal that detects the proper wiring that allows you to recept the device. If you take it out of the box and you miswire, you install it improperly, you don't get that signal. That's the normal operation of the device. That's what the instructions say. That's how people use the device. And the ALJ made a specific finding that the operations that they're talking about in their reply brief with the green lines they're showing is an abnormal operation of the device. It's abnormal in a number of ways because it involves putting the device in the wall, taking it out, putting it back in miswired. It involves keeping it in the reset state while you're doing all that. And third, it involves actually pushing the reset button after you do all that, just to get the signal that he's trying to show. The judge made a specific finding, a fact finding that's supported by substantial evidence that this is an abnormal operation. Now, Mr. Long is referring to the testimony of GPG's expert at the trial, Dr. Roberg. Dr. Roberg's testimony was explicitly rejected. And it was rejected because he didn't know the devices were sold in the trip state. There was a critical fact that was denied to him. This is how the devices are sold. This is how they're used in normal operation. He didn't know that. When confronted with the fact that the devices are that the operation he was proposing was abnormal, he talked about maybe his grandchildren might do something and fiddle around with the device in a certain way. But what they've done to the device to show the signal that he has in his reply group is actually what's abnormal about it. They disable the miswiring protection such that if a person were to use that device, they would get electrocuted if there was a ground fall. It's affirmatively not the invention because they're disabling the device in its intended use of the device. And there's specific testimony that this is a misuse of the device, that it would be a violation of the electrical code, that it would be a violation of the standard, and the patents aren't directed to violations of standards. Now, the ALJ made this, as I said, a specific finding. Oh, I didn't mention this. He made a specific finding that they didn't establish that this operation occurred. And that's important for two reasons. One, it shows that the operation is abnormal. It's not how you normally use the device. But two, it shows that the signal that Mr. Long traces in his reply brief, there's no evidence to support that signal ever existed. There's no evidence. The judge rejected that, that they never established that this device ever was manipulated this way. They never established that signal was created. And that's a fact finding. The normal and intended use of this device infringes. And they cannot avoid infringement by pointing to some abnormal scenario. That's what the Goldenblatt case says. It was an apparatus claim in that case. And the infringer said it. That's not their only argument, right? I'm sorry? That's not their only argument. That's correct, Your Honor. That's correct. That's not their only argument. But it's an important argument. They're relying on an abnormal operation. And the Hillgrave case supports us on that. That testing results that try to defeat the invention are not significant. They're not relevant. Now, I'm Could we get to mounting means now and latching means? Well, Your Honor, there's one other aspect of the detection circuit I'd like to address. And that was the issue of the circuit itself and AC power. I would point out that the predetermined nature of the signal is that you design it. You design the circuit so that current flows through it when you have proper wiring. That's how these devices are designed. This is not happenstance, as Mr. Long is making it appear to be. This circuit is designed for a particular use. And that is to sense when the line terminals are connected to AC power. The signal is predetermined based on the circuit design. And the judge actually found, he stated what a predetermined signal would be. He said detection is well understood in the context of circuits to be a circuit responds to a particular stimulus in a particular way. This is not a human notion of detection. It's a circuit. This is a circuit designed for a particular purpose. And when you get the current through it, that's the predetermined signal. The circuit performs detection by wiring that signal. Let's go to mounting means now and latching means, all right? On the latching means, the question is whether operation by magnetism is the same way for equivalence purposes as a mechanical operation. And that strikes me as a serious question as to whether it is the same way. That's the question, right? I would phrase the question a little differently, but if that's your question, I can answer it. In other words, you're saying what the issue is? Yeah, the issue is whether it's the same way when it works by magnetism as opposed to mechanically. I would, there's one issue as to whether it's the same way, but I wouldn't phrase it as magnetism versus mechanical. The case law establishes that when analyzing equivalence, you look to the assembly, the assembly of parts. You don't analyze a component by component, but you're looking to the assembly of parts. I don't understand. I mean, the question is whether magnetism and mechanical is the same way. You say in this context it is, right? We say it is. That's right. We say that it is in this context. Why should it be? I would suggest to you that the question is not so narrow about magnetism versus mechanical. It's about whether the assembly of parts performs the function of the latching means, which is retaining, releasably retaining. The reason why it's the same, Your Honor, is if you look at the description of the 398 patent, they talk about the latch retaining the conducting member in a closed position, overcoming a biasing force exerted by a coil spring pushing away. And that's exactly how GPG has patents that describe its product. And it was established in the record that these patents actually establish and show how its products work. Their patents describe the retaining function in exactly the same way that the permanent magnet applies force to overcome a coil spring pushing away. It's one force overcoming another. The judge made a specific fact finding on this on page 155 and 6, A155 and 6. And this is a question of fact. It's a question of equivalence, a question of infringement. It's a question of fact. And I would suggest to you that that fact finding is supported by substantial evidence in the GPG patent versus the 398 patent, how this is described. In addition, we have expert testimony describing how the products work, but also expert testimony of our expert, GPG's expert, and another respondent's expert, all saying that magnetic latches were well-known in the electrical device industry and specifically well-known in the GFCIR. And we have two patents that show a latching structure, prior art patents, nearly identical. Well, that may actually cut against you in the sense that if it was well-known, why wasn't it described in the patent? It sounds as though you're trying to maybe under those circumstances, we shouldn't treat it as equivalent if it was well-known and not described. The question of the doctrine of equivalence versus means plus function equivalence differs in this regard. In doctrine of equivalence, what you say would apply. But in means plus function equivalence, the fact that something was in the prior art shows that it wasn't equivalent. That's how you analyze means plus function equivalence. You look backward. Doctrine of equivalence, the law is as you described, that if it's something you could have claimed, we're not gonna give you the benefit of the doctrine of equivalence. But when you're talking means plus function equivalence, it is okay to look backwards to see what people used in the art. And of course, we point out that this shows that this is interchangeable. And remember, in this art, the judge found a level of skill on page A-108, a fairly high level of skill, B-S and double E. Let's shift over to mounting means. Okay. So if mounting means requires support, the support isn't provided in the infringing device, right? No, Your Honor, that's not correct. Not true? Okay, why is that not true? This is the ELE product. It has an outstanding plastic arm and it has, that extends from the mounting means. It's a plastic block with an outstanding arm. And the cantilever arm, which is the electrically conducting metal, rides up and down with the plastic block. And in that way, it's mounted. And again, it's a question of fact. But they're not attached, right? They're not attached. But they're not attached in the patent either. It rests on top. And in fact, there is an embodiment that a bus bar formed immediately with a leaf spring. And that embodiment is a cantilever arm. So in the patent, it's not attached, it rests on top. And that's exactly what happens here, is that the cantilever arm rides up and down with this plastic arm under it. And it's resting on the arm. And the arm guides it to the closed position and to the open position. And again, it's a question of fact about the mounting means. It's not a question of construction. You know, one last point on the detection circuit I'd like to make is that, I wanna talk one more time about the, the issue of the circuit that is being traced in the reply brief. What they're positing is that situation is actually tricking the circuit into showing a signal when it would not otherwise provide such a signal. In other words, they're manipulating the device and pushing the reset button and all they have to do to try to show the same signal. But it doesn't change the nature of the circuit. That circuit is a circuit that detects proper wiring. And I'll give you one illustration. If you were to take that device out of the wall, even after all you did to it, to create that signal, and you tripped the device, and you put it back in the wall properly wired, you would get the proper wiring signal that allows you to reset the device. So it shows that the nature of the circuit hasn't changed irrespective of what they've tried to do with the way they've manipulated. And as I suggest to you, Your Honor, it's not a fair representation of the circuit the way it's being represented here. The same thing happened at trial. The ALJ saw through it, and when the expert admitted that he didn't really understand how the product was working. If there are no further questions, I'm happy to sit down. Okay, all right. Thank you, Mr. Rivea. Thank you, Your Honor. Okay, we'll hear some rebuttal. And if there are additional points that have been raised in the questioning that you need to cover, please take them up. Okay, Mr. May. Your Honor, not once does the 340PFD refer to receptacle outlets as low terminals. Now, regarding witness testimonies, not once did any witness testify that receptacle outlets are low terminals. They were very careful in referring to receptacle outlets as user-low terminals or user-accessible low terminals. Now, if receptacle outlets are not referred to as user-low terminals, we probably wouldn't be here today. The commission probably would never rule that kind of instruction to include receptacle outlets. So the real question on this appeal is the linguistic similarity. So just as guinea pigs are not pigs, seahorses are not horses, we ask this court to look past linguistic similarities. Now, let me just emphasize one more point before I sit down. Possibly more cited, Mr. Osterbrock their own witness testimony at Joint Appendix 40378. Now, let's start reading from Appendix 40377, the last line of that page. There was a question asked to the witness. By user-low terminals, you mean outlets on the GFCI. Is that correct? The answer was yes. So if you continue to read the page of Appendix 40378, that witness was very careful in referring to receptacle outlets as user-low terminals. I believe another place he said user-accessible low terminals. So it's true, even in the 340 patent, low terminals are connected to receptacle outlets. I think the confusion, so they're all eventually connected to low, but in the terminology, even in the way that the witnesses use, they refer to user-low terminals connected to user- I don't know why you keep talking about that, because the term user-low terminals is not used in the 340 patent, and I'm not even sure that there's any testimony that user-low terminals has a well-understood meaning in the art, and they've admitted that low terminals hasn't been identified as having a meaning in the art. So, I mean, you know, I don't know. Right, Your Honor, I mean, if the court determines that intrinsic evidence is clear that the claim of low terminals cannot include receptacle outlets, you have to write a case here. However, if the court does not get into intrinsic evidence, it's a claimant's position that the witness, that the testimony is not conclusive, and in a way, actually, it's consistent with Trimone's testimony, and Trimone's position that the claimant cannot include receptacle outlets. I guess we have further questions. Thank you, Mr. Long. Mr. Long? Again, I represent General POTEC. First question is, does General POTEC's device infringe if you find that the AC signal cannot be a predetermined signal? The answer is no, we do not infringe. There's no dispute about that. And we didn't take the position that that was the predetermined signal. We haven't taken any position on that. If you change the claim construction so that that is not a predetermined signal, GPT's device does not infringe. So secondly, I'm gonna go back to this detection circuit, and the first thing I'm gonna do is correct a false and scandalous remark that was made by Paz and Seymour's comment. That was that our device would electrocute someone if it's miswired. That's not true. We all, even when miswired, it provides fault detection. It trips on a fault, but it doesn't provide miswire. It doesn't trip just because it's miswired, but it still provides fault detection. The problem, Paz and Seymour's analysis, is they're looking at overall operation of the device, but the analysis has to focus on the detection circuit. Is that circuit, is the acute circuit, distinguishing between proper and improper wiring? We showed every possible situation, every possible scape of that device, including some that he says is never gonna happen, but we showed every possibility. It's never distinguishing between proper and improper wiring, and is there a burden of proof? Not. We don't have to disprove it. They have to prove it's distinguishing, and it's not. I know my time is out, but I would like to make one comment that was raised on the 398 on the magnetic, the latch remains. If I may make one brief comment about that. Yes, I think it would help to respond to Judge Lack's question on the magnetic mechanical. So if you compare the simple magnetic latch in GPG's device, it's simple. It's just a simple magnet. If you compare that with the invention, with all these complicated magnetic, I mean, mechanical movements, you got a pin coming down and it's moving diagonally, I mean, that's like Rube Goldberg. That's what Rube Goldberg invented. We don't do that simple. It's just a magnet. It's not just the fact that it's magnetic. It's also, it's got all these moving parts. General prototypes is just a magnet, just on the back. It's not, it's not Rube Goldberg. Thank you. Okay, thank you, Mr. Leung. Mr. Chen. Thank you, Your Honor. I'd like to address Judge Dyke's question about the mounting means in 398 patent. Now, the other side said, the supporting is the equivalent of mounting. The 398 patents state differently. In 398 patent, figure 11, it shows the block 82, which is the mounting means, and particularly at column one, line 62 through 64, it states the fast part, remember, are carried in space relation on the movable block. It's carried. Now, this is resting or supporting on R, but it's not carried or mounted. If you grab it and move it with it, this is carried and mounted, and this is just resting and supporting. So I suggest that the interpretation that's supporting, it is resting in ELE's cantilever arms, resting on moving block sometimes. But in the 398 patent, it's talking about mounting block 82, carrying, actually there's two vertical members, which clips the boss bar member and move, carries it, move it up and down with it. That's particularly shown in figure 11 and discussed at column one, 62 through 64. And also, I'd like to further address your honor's concern about predetermined signal. Now, predetermined signal is not just something, any AC current coming into the device. The predetermined signal means something both sides expert, Dr. Harmon and Dr. Engel on our side agree predetermined means something, preset value that differentiate the wiring state. Now in 398 patent, there's two places used the word predetermined, which sheds light of how that term, predetermined signal should be interpreted. At line, column two, line six to seven of the 340 patent, it talks about a predetermined threshold of a differential current. So that's one place where the word predetermined and the second instance in 340 patent is at column four, line 43 through 46. We're talking about a predetermined value with regard to a predetermined time. So both instances, the predetermined means something, it's a preset value, carries, goes with it. It's not just any AC current that goes into the receptacle. Thank you, your honor. Thank you, Mr. Chen, we've raised some new issues, but I believe everything has been covered. Is there anything else that you need to ask? The case was taken under submission, both cases.